HODGSON, Administrator, *v.* MACY.

In the year 1837, *A.* sold *B.* eighty acres of land on which there was a mill,
and gave a title-bond. Afterwards *B.* sold the land to *C.*, and as-
signed to him the title-bond. *C.* and his son had been working and

Nov. Term, 1856.

HODGSON
v.
MACY.

dealing in partnership, and had unsettled accounts. In *August*, 1845, *C.*, having paid for the land, directed the deed to be made to his son. The deed was delivered to the father, the son not being present. The father afterwards delivered it to the son. In the year 1846, the father and son had a settlement of accounts, when it was agreed that the son should have seventy acres of the land and the father ten acres, embracing the mill. In the year 1848, the son purchased the father's ten acres for 1,000 dollars, of which he paid 100 dollars down, and obtained time on the balance. In the year 1851 the son died. His administrator obtained an order to sell, and sold, the entire eighty acres to make assets for the payment to the father of the balance of 900 dollars of the purchase-money. Afterwards the father sued the administrator for the 900 dollars.

*Held*, that, as the deed to the son was made under the R. S. of 1843, there was no resulting trust in favor of the father.

*Held*, also, that where a father buys and pays for land, and has the deed made to his child, the law infers that it is an advancement; but this inference may be repelled by proof that the father did not intend it as such.

*Held*, also, that, in this case, the conveyance to the son was not an advancement; but was made in payment of a debt, under a subsisting agreement that the father should hold the ten acres in his own right.

*Held*, also, that, under the facts stated, the agreement was lawful, and the son was in equity bound by it to convey the ten acres to the father; and the father had a right to sell, and did sell, his equitable interest to the son.

*Wednesday, November 26.*

APPEAL from the *Henry* Court of Common Pleas.

DAVISON, J.—The complaint charges that *Henry Macy*, who died intestate, in his life-time was indebted to *Jonathan Macy*, the plaintiff below, 900 dollars for a certain mill-property purchased of him by the intestate. The administrator, who was the defendant, answered— 1. That he was not indebted. 2. Payment. 3. The statute of limitations. Replies in denial of the answer. The cause was submitted to the Court, who found for the plaintiff; and over a motion for a new trial, there was judgment.

The following are the facts: In the year 1837, one *Elias Ratliff*, being the owner of eighty acres of land in *Henry* county, on which was situate a mill-property, sold it to one *Moses Jones* for 1,700 dollars, and gave him a title-bond. *Jones* afterwards sold to *Jonathan Macy*, and assigned him the bond, who, in pursuance of

his purchase, took possession of the land and remained therein until the spring of 1846. Before this year *Jonathan* and his son *Henry*, the intestate, had worked together in *Grant* county, but had returned to *Henry* county in the fall of 1844, when *Jonathan*, *Henry*, and one *David Macy*, who owned a farm in the immediate vicinity of the mill-property, formed a partnership and worked together for the space of about one year, using, for the purposes of the partnership and in common, the several tracts of land owned by *Jonathan* and *David*. On the 11th of *August*, 1845, and while the parties were still working together as partners, *Jonathan*, having paid for the eighty acres, procured *Ratliff* to make a deed for it to *Henry*, who was not present when the deed was made. It was delivered to *Jonathan*, who then stated to *Ratliff* that he expected to let *Henry* have the land or a part of it. In the year 1846, the three *Macys* dissolved their partnership, when a settlement was had between *Henry* and *Jonathan*. Prior to this, *Henry* told *David Macy*, a witness, that he and his father "were about to settle for their work together, and that he had agreed to take seventy acres of the land." And after the settlement he moved a fence so as to make a division fence between the seventy acres and the remaining ten acres, which embraced the mill. In the proceedings the latter is designated "the mill-property." After the removal of the fence, *Henry* remained in possession of the seventy acres and *Jonathan* in that of the mill-property, until the year 1848, when it also passed into *Henry's* possession. When the dissolution took place, the rebuilding of the mill had been commenced, which rebuilding *Jonathan* afterwards, and while he remained exclusively in possession of the mill-property, completed at his own expense. There was proof that *Henry*, between the year 1848 and his death, which occurred about the 25th of *August*, 1851, distinctly and repeatedly stated to various persons that he had bought the mill-property of *Jonathan*, for which he was to pay him 1,000 dollars; that he had paid 100 dollars, and was to

Nov. Term, 1856.

HODGSON
v.
MACY.

have time on the balance. It also appeared that *Henry*, in the year 1849, and after he had obtained possession of the mill, repaired and otherwise improved the mill-property. And it was further proved that the defendant, as administrator, filed his petition in the Common Pleas of *Henry* county, wherein he recognized the 900 dollars sued for in this action as due from the intestate's estate to the plaintiff, and on account of that debt, procured an order of Court directing him to sell the whole eighty acres, which sale was accordingly made.

Under the law of uses and trusts, as it stood prior to the revision of 1843, when lands were conveyed to one person and the consideration was paid by another, there was a resulting trust in favor of him who paid the money. But when the deed to *Henry Macy* was made, that revision was in force, and contained a statute under which no use or trust resulted in favor of him who paid the money; and the title vested in the person named as alienee in the deed. R. S. 1843, p. 445. It is therefore evident that, in this case, there is no resulting trust. But the appellant says that *Jonathan* having paid the purchase-money and directed the conveyance to be made to his son, it must be viewed as an advancement. Upon the naked fact that a father buys and pays for land and has the deed made to his child, the inference of law is that it is an advancement to the child; but it is competent to meet and repel such inference by proof that the father did not intend it as an advancement. In such cases the question is one of intention; and if the evidence before us does not rebut the inference, then *Henry's* title by virtue of the deed must be held complete both in law and equity. But may it not be inferred, from his statements prior to the settlement, that *Jonathan* was indebted to him? He said they were about to settle and he had agreed to take seventy acres of the land; and having taken possession of it after the settlement, the deduction is not an unfair one, that he took the seventy acres in payment of the debt. He did not, however, assume ownership over the mill-property,

though he had received a deed for the entire tract; but of the last-named property *Jonathan* remained in possession, using and improving it as his own, until he sold it to *Henry*. In view of the whole case, we are led to the conclusion that the deed was delivered to *Henry* under a subsisting agreement between him and *Jonathan* that the latter should hold the mill-property in his own right., Under the facts stated, such an agreement would not be in conflict with any rule or principle of law, and the result is, *Henry* was bound in equity to convey him the ten acres, not on account of his having originally paid for the whole tract, but in virtue of an agreement which, though not technically proved, plainly existed. It follows that *Jonathan* did not intend either to give or advance the mill-property to his son. Such appears to have been the finding of the Court below, sitting as a jury, and we are inclined to sustain its conclusions. He was, then, entitled to an equitable interest in the property which he had a perfect right to dispose of by sale, and which, as before stated, he did sell to his son *Henry*. This sale and the price agreed on is clearly proved not only by *Henry's* admissions in his life-time, but by those of his administrator since his death. We cannot, therefore, perceive any valid ground upon which the present action can be defended.

*Per Curiam.*—The judgment is affirmed with 3 per cent. damages and costs.

*W. Grose*, for the appellant.

*E. Johnson* and *J. T. Elliott*, for the appellee.